Appendix 3.

Republic of the Philippines
Department of Labor and Employment
PHILIPPINE OVERSEAS EMPLOYMENT ADMINISTRATION

## CONTRACT OF EMPLOYMENT

KNOW ALL MEN BY THESE PRESENTS:

This contract, entered into voluntarily by and between:

Name of Seafarer : NAVARETTE, EMMANUEL Y RECENTES
Date of Birth : 21-Dec-1980 Place of Birth: MARAWI CITY
Address : BALUBAD 1ST SILANG CAVITE 3118

SSRB No. : B1016576SRC No. : 0462680-02   License No.:
hereinafter referred to as the Employee,
and

SILVERSEA CRUISES LTD/SILVER SPIRIT SHIPPING CO.LTD.
on whose behalf V.SHIPS LEISURE LTD acts as the manager together with its
Philippine crewing agent, North Sea Marine Services Corporation.
Address of Principal/Shipowner:SASSOON HOUSE, SHIRLEY STREET AND VICTORIA A
For the following vessel :
   Name of vessel: SILVER SPIRIT      Flag: BAHAMAS      GRT:36000
   Official No:9437866  Year Built:  2009      Class :
hereinafter referred to as the Employer.
WITNESSETH

1. That the Seafarer shall be employed on board under the following
   terms and conditions:
   1.1 Duration of Contract : 8 months
   1.2 Position : ORDINARY SEAMAN
   1.3 Basic Monthly Salary : $480.00 per month
   1.4 Hours of Work : 44 Hrs. per week
   1.5 Overtime Rate : $243.00  Guaranteed O.T. 70 hrs. Weekdays
                       $180.00 Weekend Compensation
   1.6 Overtime Hourly Rate : $3.47
   1.7 Vacation Leave Pay : $144.00 per month
   1.8 Subsistence Pay : $162.00 per month
   1.9 Point of hire : Manila, Philippines
   2.0 Collective Bargaining Agreement, if any: ITF/TCC AMOSUP
2. The herein terms and conditions is in accordance with Governing
   Board Resolution No. 09 and Memorandum Circular No. 10 both
   Series of 2010, shall be strictly and faithfully observed.
3. Any alterations or changes in any part of this contract shall be
   evaluated, verified, processed and approved by the Philippine
   Overseas Employment Administration (POEA). Upon approval, the
   same shall be deemed an integral part of the Standard Terms &
   Conditions Governing the Employment of Filipino Seafarers on
   board Ocean-Going Vessels.
4. To ensure efficient administration of employment of ship personnel and
   in order to comply with all applicable laws, rules and regulations,
   it shall be the policy of the Employer and the Manager and each of
   their parent, subsidiary, associated and affiliated companies to
   maintain a register of seafarers under employment. The register shall
   contain information in connection with the employment which shall
   include personal data/information, personnel and pension administration,
   religion, membership in trade unions, physical or mental health
   condition, commission or alleged commission of an offense and any
   proceedings relating thereto and the outcome of such proceedings
   and sea service record. The Employee hereby consents to the holding
   and processing of all such data by any of the entities aforesaid.
5. Violators of the terms and conditions of this contract with its
   approved addendum shall warrant the imposition of appropriate
   disciplinary or administrative sanctions against the erring party.

IN WITNESS WHEREOF, the parties have hereto set their hands this
Date 20 May 2013 at Manila, Philippines.

NAVARETTE, EMMANUEL Y RECENTES                    MR. EDWIN T. FRANCISCO
Seafarer                                          For the Employer:

                    Department of Labor and Employment
                    Philippine Overseas Employment Administration

Date 01 July 20,2013   Verified and approved by the POEA
                                                  Signature of POEA Official

JUN 1 1 2013!

THIS AGREEMENT (the "Agreement") IS MADE BETWEEN

The Owner ("Owner") of the ship(s) on which the Seafarer is engaged pursuant to this Agreement (the "Ship") through their agent who are in membership with the Joint Negotiating Group, V.Ships Leisure Inc. c/o "Les Industries", 2 Rue du Gabian, MC 98013 Monaco as agents (the "Agent")

AND

Federazione Italiana Trasporti – Settore Maritimo e Pesca, an ITF affiliated trade union duly registered in Italy with its main office at Via Antonio Musa, 4 – 00161 Roma (the "Union").

The terms of Part II (namely, the attached ITF-approved TCC Uniform Agreement Version 1: Revision: 2 Issued:01-JAN-2013 19pp) form part of the operative provisions of the Agreement and references to the Agreement shall, unless the context otherwise requires, include reference to Part II. In the event of a conflict between Part I and Part II the provisions of Part II shall prevail to the extent of such conflict.

This Agreement comes into effect on January 1st, 2013 and is valid till 2013.

## Service

| | |
|---|---|
| **90** | BOX 1 — DAYS: 1ST TIME PROBATIONARY PERIOD WITH AGENT [ARTICLE 3.1] |
| **10±1** | BOX 2 — MONTHS: ON BOARD SERVICE PERIOD [ARTICLES 5.1 AND 5.2] |
| **44** | BOX 3A — HOURS: NORMAL HOURS OF DUTY PER WEEK FOR D&E [ARTICLE 6.1] |
| **70** | BOX 4A — HRS/MONTHS: GUARANTEED OVERTIME FOR D&E RTGS [ARTICLE 8.2] |

| | |
|---|---|
| **40** | BOX 3B — HOURS: HOURS OF DUTY PER WEEK FOR HOTEL [ARTICLE 6.1] |
| **60.62** | BOX 4B — HRS/MONTHS: GUARANTEED OVERTIME FOR HOTEL [ARTICLE 8.2] |

## Wages

| BOX 6 | |
|---|---|
| COMMENCEMENT OF WAGES: AS PER CONTRACT OF EMPLOYMENT | **80** BOX 7 — PERCENT: MAXIMUM [OF BASIC WAGES] REMITTABLE MONTHLY AS ALLOTMENTS [ARTICLE 11.1] |
| | **09** BOX 8A — DAYS: D&E CREW LEAVE PER MONTH ⎫ (OR PRO RATA FOR SHORTER PERIODS) [ARTICLE 12.2]. |
| | **03** BOX 8B — DAYS: HOTEL CREW LEAVE PER MONTH ⎭ FOR PAID LEAVE, CALCULATION IN BOX 20 APPLIES. |

## Compensation

| US$ MAX LIMITS FOR | | PAYABLE TO | ARTICLE REF | |
|---|---|---|---|---|
| **3000** | BOX 9 LOSS/DESTRUCTION OF PERSONAL EFFECTS | ALL SEAFARERS | 18.2 | |
| **80,000** | BOX 10A DISABILITY | SR. OFFICERS | 25.3 & 25.4 | BOX 12 |
| **80,000** | BOX 10B DISABILITY | JR. OFFICERS | 25.3 & 25.4 | AS PER SCALE IN PART II ANNEX2 |
| **80,000** | BOX 11 DISABILITY | RATINGS | 25.3 & 25.4 | |
| **75,000** | BOX 13 LOSS OF LIFE/DEATH IN SERVICE | NEXT OF KIN | 26.1.1 | |
| **15,000** | BOX 14 LOSS OF LIFE/DEATH IN SERVICE | DEPENDENT CHILD | 26.1.2 | |

| | |
|---|---|
| **18** | BOX 15 — YEARS: AGE BELOW WHICH CHILDREN ENTITLED TO RECEIVE COMPENSATION [BOX 14 AND ARTICLE 26.1] |
| **4** | BOX 16 — DEPENDENT CHILDREN: MAXIMUM NUMBER ELIGIBLE TO RECEIVE COMPENSATION [BOX 14 AND ARTICLE 26.1] |

## Welfare Contributions/Union Fees

| | |
|---|---|
| **10** BOX 17 — PERCENT OF USD 250 PER POSITION PER ANNUM (AS PER SIGNED MOU WITH UNION) AS WELFARE CONTRIBUTION. | BOX 19 — UNION ACCOUNT DETAILS BY REMITTANCE AS PER UNION'S INSTRUCTIONS. |
| **XX** BOX 18 — UNION FEES PER POSITION PER MONTH AS PER SIGNED MOU WITH UNION | |
| **#** BOX 19A NOT APPLICABLE | |

## Jurisdiction

The Union and the Owner agree that any dispute arising out of this Agreement can and should be resolved through friendly negotiations. If every effort has been exerted to resolve such conflicts and, if no solution is found, the same may be brought for judicial resolution at London, applying English Law.

## Nationality Specific Clauses (if any)

1. The definition of Senior Officers is as follows: Master / Chief Engineer / Staff Captain / Staff Engineer / Doctor / Hotel Director

© Copyright V.Ships Management Inc. 01/JAN/2012

NOTE: The brief captions accompanying each box above are not to be construed as definitions but as facilitating reference to Articles in Part II or to other forms or documents. Any additions or alterations to printed matter on this page must be accompanied by signatures of both parties.

BOX 20

| Rank | Basic Monthly Wage | Consolidated Overtime | Leave | Leave Subsistence | Total Monthly Guaranteed Wage | IMO/STCW Training Allowance | Medical | IMTS Training | Total Monthly Consolidated wage |
|---|---|---|---|---|---|---|---|---|---|
| Senior Master/Master | 2257 | 1494 | 677 | 182 | 4591 | 129 | 160 | 180 | 5059 |
| Chief Engineer | 2132 | 1411 | 640 | 162 | 4344 | 122 | 152 | 167 | 4776 |
| Staff Captain/Staff Engineer | 2006 | 1326 | 602 | 162 | 4098 | 115 | 145 | 153 | 4511 |
| Chief Mate/1st Asst Engineer/ Safety Officer/ Hotel Engineer/Doctor/Chief Electrician | 1599 | 1078 | 480 | 162 | 3319 | 93 | 136 | 100 | 3833 |
| Nurse / Chief Security Officer | 949 | 637 | 285 | 162 | 2033 | 57 | 83 | 50 | 2223 |
| 2nd Mate/ 2nd Asst. Engineer/ Communication Officer /AC Engineer | 1128 | 747 | 339 | 162 | 2376 | 67 | 93 | 100 | 2636 |
| 3rd Mate / 3rd Asst. Engineer/ Electronic Officer/ 1st Electrician | 1087 | 729 | 326 | 162 | 2304 | 65 | 91 | 100 | 2560 |

| Rank | Basic Monthly Wage | Guaranteed Monthly OT | Weekend Compensation | Leave | Leave Subsistence | Total Monthly Guaranteed Wage | IMO/STCW Training Allowance | Medical | Admin & Welfare | IMTS Training | Total Monthly Consolidated wage | Overtime Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bosun/ Plumber/ Carpenter/Chief Repairman/ Chief Fireman/ Reefer Tech/ Fitter / Joiner / Upholsterer / Mechanic | 700 | 354 | 263 | 210 | 162 | 1690 | 47 | 40 | 33 | 60 | 1870 | 5.06 |
| Asst Bosun / Carpenter / Plumber | 665 | 336 | 250 | 199 | 162 | 1612 | 45 | 40 | 30 | 60 | 1787 | 4.80 |
| Able Seaman/ Motorman/ Engine Storekeeper/ Oiler | 627 | 317 | 236 | 188 | 162 | 1530 | 43 | 40 | 28 | 60 | 1701 | 4.53 |
| Asst Reefer tech/ Asst Electrician | 517 | 262 | 194 | 155 | 162 | 1290 | 36 | 40 | 21 | 60 | 1447 | 3.74 |
| Incinerator / Garbage Disposal man | 502 | 254 | 189 | 151 | 162 | 1258 | 35 | 40 | 20 | 60 | 1413 | 3.63 |
| Ordinary Seaman / Wiper | 502 | 254 | 189 | 151 | 162 | 1258 | 35 | 40 | 20 | 60 | 1413 | 3.63 |
| Deck Cadet/Engine Cadet/ Security Guards/ Ship's Secretary | 408 | 206 | 153 | 122 | 162 | 1052 | 29 | 40 | 14 | 60 | 1195 | 2.95 |

1. In the tables above and below the following are not payable in recognition of costs incurred by the Owner towards:
- IMO/STCW Training Cost which is a weighted average
- Medical is the pre/post engagement medical attention allowance and is a weighted average
- Administration and Welfare is the allowance that covers welfare costs
2. IMTS Training is recognition by the Union of the V.Ships training program to which the Owner agrees to contribute.

| Rank | Group | Basic Monthly Wage | Difference Between 40 hrs/week & 56 hrs/week | Leave Compensation | Overtime Rate | Guaranteed Overtime | Total Monthly Wage | Allowance(s) If any | Total Monthly Guaranteed Wage | Welfare | Training | Total Wage Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Days** | | | | | 3 | | | | | | | |
| **Overtime Hours** | | | 69.28 | | | 60.62 | | | | | | |
| ***ADMINISTRATION*** | | | | | | | | | | | | |
| Hotel Director | A | 1665 | 533 | 240 | 0.00 | 729 | 3457 | 0 | 3457 | 30 | 20 | 3517 |
| Food & Beverage Manager/Hotel Manager/ChiefSteward | A | 1283 | 627 | 181 | 0.00 | 549 | 2610 | 0 | 2610 | 30 | 20 | 2660 |
| Chief Purser | A | 1283 | 627 | 181 | 0.00 | 549 | 2610 | 0 | 2610 | 30 | 20 | 2660 |
| Crew Purser/1st Purser/Concierge | A | 1005 | 503 | 145 | 0.00 | 440 | 2093 | 0 | 2093 | 30 | 20 | 2143 |
| Asst. Food & Beverage Manager | A | 1005 | 503 | 145 | 0.00 | 440 | 2093 | 0 | 2093 | 30 | 20 | 2143 |
| 2nd Purser | B | 803 | 402 | 116 | 0.00 | 352 | 1673 | 0 | 1673 | 30 | 20 | 1723 |
| Assistant Purser/Receptionist | B | 615 | 310 | 89 | 4.47 | 271 | 1288 | 0 | 1288 | 30 | 20 | 1338 |
| Night Auditor / Crew Accountant / Printer | B | 555 | 278 | 80 | 4.01 | 243 | 1156 | 0 | 1156 | 30 | 20 | 1206 |
| ***GALLEY*** | | | | | | | | | | | | |
| Executive Chef | A | 1283 | 627 | 181 | 0.00 | 540 | 2610 | 0 | 2610 | 30 | 20 | 2660 |
| (Executive) Sous Chef | A | 1086 | 544 | 157 | 0.00 | 476 | 2263 | 0 | 2263 | 30 | 20 | 2313 |
| Chief Butcher/Chief Pastryman/Chief Baker | B | 780 | 391 | 113 | 5.64 | 342 | 1626 | 0 | 1626 | 30 | 20 | 1676 |
| 1st Cook/Crew Cook | B | 666 | 333 | 96 | 4.81 | 292 | 1387 | 0 | 1387 | 30 | 20 | 1437 |
| 2nd Pastryman | B | 473 | 237 | 68 | 3.42 | 207 | 985 | 0 | 985 | 30 | 20 | 1035 |
| 2nd Cook | B | 555 | 278 | 80 | 4.01 | 243 | 1156 | 0 | 1156 | 30 | 20 | 1206 |
| Asst.Cook/Asst.Pastryman/Asst.Baker/AsstCrewCook | B | 389 | 195 | 56 | 2.81 | 170 | 810 | 0 | 810 | 30 | 20 | 860 |
| 1st Utility | B | 376 | 188 | 54 | 2.72 | 165 | 783 | 0 | 783 | 30 | 20 | 833 |
| Utility | D | 320 | 160 | 46 | 2.31 | 140 | 666 | 0 | 666 | 30 | 20 | 716 |
| ***STOREROOMS*** | | | | | | | | | | | | |
| Food and Beverage Controller/Inventory Controller | B | 794 | 398 | 115 | 5.74 | 349 | 1655 | 0 | 1655 | 30 | 20 | 1705 |
| Provision Master | B | 794 | 398 | 115 | 5.74 | 348 | 1655 | 0 | 1655 | 30 | 20 | 1705 |
| Storekeeper | B | 658 | 329 | 95 | 4.75 | 288 | 1370 | 0 | 1370 | 30 | 20 | 1420 |
| Utility | D | 320 | 160 | 46 | 2.31 | 140 | 666 | 0 | 666 | 30 | 20 | 716 |
| ***BAR & LOUNGES*** | | | | | | | | | | | | |
| Bar Manager | A | 890 | 445 | 128 | 0.00 | 380 | 579 | 1274 | 1653 | 30 | 20 | 1903 |
| Head Bartender / Head Wine Steward | B | 681 | 341 | 98 | 4.92 | 258 | 443 | 975 | 1418 | 30 | 20 | 1468 |
| Bartender | B | 555 | 278 | 80 | 4.01 | 243 | 361 | 795 | 1156 | 30 | 20 | 1206 |
| Asst. Bartender | C | 444 | 222 | 64 | 3.21 | 195 | 289 | 636 | 926 | 30 | 20 | 976 |
| Chief Deck Steward | B | 650 | 278 | 80 | 4.01 | 243 | 361 | 795 | 1156 | 30 | 20 | 1206 |
| BarWaiter(ress)/Deck Steward/Wine Steward/Sommelier | C | 402 | 201 | 58 | 2.9 | 176 | 261 | 576 | 837 | 30 | 20 | 887 |
| Asst. Wine Steward | C | 386 | 193 | 56 | 2.79 | 169 | 251 | 553 | 804 | 30 | 20 | 854 |
| Utility/Runner | D | 320 | 160 | 46 | 2.31 | 140 | 208 | 458 | 666 | 30 | 20 | 716 |
| ***RESTAURANT*** | | | | | | | | | | | | |
| Maître d'Hotel | A | 890 | 445 | 128 | 0.00 | 380 | 579 | 1274 | 1653 | 30 | 20 | 1903 |
| Asst. Maître d'Hotel | B | 811 | 406 | 117 | 5.86 | 355 | 527 | 1162 | 1689 | 30 | 20 | 1739 |
| Head Waiter/Grill Host | C | 664 | 347 | 100 | 5.01 | 304 | 451 | 994 | 1445 | 30 | 20 | 1495 |
| Deputy Head Waiter | C | 669 | 333 | 96 | 4.81 | 292 | 433 | 954 | 1387 | 30 | 20 | 1437 |
| Waiter | B | 555 | 278 | 80 | 4.01 | 243 | 361 | 795 | 1156 | 30 | 20 | 1206 |
| Asst. Waiter/Commis. de Rang/Asst. Grill Host | C | 402 | 201 | 58 | 2.90 | 176 | 261 | 576 | 837 | 30 | 20 | 887 |
| Busboy | C | 333 | 167 | 48 | 2.41 | 146 | 216 | 478 | 694 | 30 | 20 | 744 |
| Messman/Buffet Runner/Utility | D | 320 | 160 | 46 | 2.31 | 140 | 208 | 458 | 666 | 30 | 20 | 716 |
| ***HOUSEKEEPING*** | | | | | | | | | | | | |
| Chief Housekeeper | A | 1283 | 627 | 181 | 0.00 | 549 | 2610 | 0 | 2610 | 30 | 20 | 2660 |
| Asst. Housekeeper/Head Stewardess | C | 694 | 347 | 100 | 5.01 | 304 | 451 | 994 | 1445 | 30 | 20 | 1495 |
| Cabin Steward | B | 555 | 278 | 80 | 4.01 | 243 | 361 | 795 | 1156 | 30 | 20 | 1206 |
| Bell Captain/Night Steward | C | 402 | 201 | 58 | 2.90 | 176 | 261 | 576 | 837 | 30 | 20 | 887 |
| Tailor / Upholsterer / 1st Utility / Ch. Pool Attendant | D | 324 | 162 | 47 | 2.34 | 142 | 211 | 464 | 675 | 30 | 20 | 725 |
| Utility/Pool Attendant/Cleaner/Officer Steward | D | 320 | 160 | 46 | 2.31 | 140 | 208 | 458 | 666 | 30 | 20 | 716 |
| ***LAUNDRY*** | | | | | | | | | | | | |
| Linenkeeper | B | 531 | 266 | 77 | 3.84 | 233 | 1107 | 0 | 1107 | 30 | 20 | 1157 |
| Chief Laundryman | B | 402 | 201 | 58 | 2.90 | 176 | 837 | 0 | 837 | 30 | 20 | 887 |
| Laundryman | D | 324 | 162 | 47 | 2.34 | 142 | 675 | 0 | 675 | 30 | 20 | 725 |

For V.Ships Leisure Inc.
Acting as Manager on behalf of the
Owners or employers

For FIT-CISL - Rome,
International Personnel / Seafarers dept.

_____

R. Sauleau
Crew Director

_____

The National Responsible
Mr. Remo Di Fiore

NOTE: The brief captions accompanying each box above are not to be construed as definitions but as facilitating reference to Articles in Part II or to other forms or documents. Any additions or alterations to printed matter on this page must be accompanied by signatures of both parties.

© Copyright by V.Ships Management Inc. 01/Dec/2012

# CRUISE TCC AGREEMENT

## SUPPLEMENTARY AGREEMENT

**In consideration of**

The entry into management with V.Ships Leisure INC , of Silver Sea Cruise vessels with agreement currently concluded with FIT/CISL (The " Agreements")

The necessity to keep the number of agreements to a minimum but at the same time maintain continuity of past practices

**It is agreed by the parties with effect from 1ˢᵗ January 2013**

In respect of the vessels listed below left and covered under the following Agreement (VSLI Agreement)

Of 2 parts signed between parties:

Part I : COS:ALL NATIONALITIES ITF CRUISE TCC – FIT/CISL

      VERSION: 2 REVISION: 0 ISSUED:**01/2013**

Part II: COS:ALL NATIONALITIES ITF CRUISE TCC – FIT/CISL

      VERSION:1 REVISION:1 ISSUED:**01/2013**

That the following Articles of the VSLI Agreement are deemed incorporated/substituted as follows:

O Article 11.1 SUSTITUTED to read: Each Seafarer to whom this Agreement applies shall make monthly Allotments comprising 80% of total wages after allowing for any deductions as specified in Article 11.2

O Article 12.1 INCORPORATED as follows and APPLICABLE FOR HOTEL PERSONNEL ONLY: All personnel who have completed their contracts shall be entitled to collect their (15%) accrued leave pay when Debarking the vessel upon successful completion of contract.

O Article 23.1 SUBSTITUTED to read and APPLICABLE FOR HOTEL PERSONNEL ONLY: Sick pay is calculated at the rate of USD$25 per day as applicable under the terms of this Agreement. That clause 21.1 concerning repatriation expenses reimbursement will apply in full to all onboard Silver Sea Cruise hotel personnel.

| Vessel | Flag | IMO N° | For V.Ships Leisure INC. | For FIT/CISL Rome |
|--------|------|--------|--------------------------|-------------------|
| Silver Explorer | Bahamas | 8806747 | | |
| Silvercloud | Bahamas | 8903923 | Mr Raphael Sauleau | Mr Remo Di Fiore |
| Silverwind | Bahamas | 8903935 | | |
| SilverShadow | Bahamas | 9192167 | | |
| SilverWhisper | Bahamas | 9192179 | | |
| SilverSpirit | Bahamas | 9437866 | DATE: 01.01.13 | PLACE: ROME |

# CRUISE TCC AGREEMENT PART II

## 1. Application

1.1     These terms are to be read together with Part I hereto signed by the Owner and the Union. Terms and expressions used herein shall have the same meaning as in Part I unless stated otherwise. References herein to Box numbers refer to the Box numbers in Part I.

1.2     This Part II is based on the ITF Framework Agreement and sets out the standard terms and conditions applicable to all seafarers serving on a ship in respect of which there is an ITF Special Agreement between the ITF and the owner or operator and, without prejudice to Article 1.3, shall apply whether or not a seafarer has signed a Contract of Employment. The owner agrees to ensure that signed copies of Parts I (which references this Part II) and the ITF Special Agreement are available on board in English.

1.3     Each Seafarer and Owner or his Agent shall sign a Contract of Employment (the "Contract of Employment") in original issued by the owner for a given period of service on board the ship. The provisions of the Agreement shall form an integral part of the contract of employment and of the Ship's Articles of Agreement (the "Articles"). References to the "Seafarer", "Ship", "ITF Special Agreement", "Union", "ITF", "Owner", "Company" and "Agent" in Parts I and II shall have the same meaning as in the Contract of Employment and the ITF Special Agreement. The seafarer is also referred to as "Officer" or "Rating" as appropriate and can mean any person who is employed or engaged or works in any capacity covered by this agreement. "MLC" means Maritime Labour Convention adopted by the General Conference of the International Labour Organization on 23 February 2006.

1.4     In signing the Contract of Employment, the seafarer expressly agrees that the owner, or the Master on behalf of the owner, engages him for the agreed duration and that the agent and its sub-agent if any, is not the employer of the seafarer.

1.5     The terms of the Agreement shall apply from the date on which the seafarer departs from the place of engagement whether or not:

       1.5.1     he has signed the Articles until the date when he signs off or if later, the date until which, in accordance with the Agreement the owner is liable for payment of wages;

       1.5.2     any employment contract is executed between the seafarer and the owner;

       1.5.3     the ship's Articles are endorsed or amended to include the rates of pay specified in this Agreement

1.6     Nothing in this article is meant to change the current practice under which wage payment commences as on the date indicated in Box 6.

## 2. Pre-Service

2.1     Prior to embarkation, the seafarer will be required to pass a pre-employment medical examination which may include tests to determine the use of drugs or medicines that may impair performance and adversely affect the safety of the crew and/or ship, and/or drug and/or alcohol abuse. The seafarer must answer faithfully any questionnaire regarding his state of health. The pre-employment medical examination shall be conducted in the place of engagement by the company's selected medical practitioners, to meet the requirements of the applicable flag state authority in compliance of the ILO MLC 2006, and relevant national requirements as appropriate. Failure by the seafarer to comply with any of the requirements in this article may affect his or his dependants' entitlement to compensation under Articles 22, 23, 24, 25 and 26. The seafarer shall be entitled to receive a copy of the medical certificate issued in respect of such an examination.

2.2     The seafarer shall provide in writing to the agent, full details of his nominated next of kin and his dependent children.

2.3     The seafarer must be in possession of the requisite valid watch keeping certificates and other mandatory certification in compliance with the STCW convention 1995 and with the requirements of any subsequent amendments or updates to that convention. To ensure conformity with mandatory certification requirements the owner will assist the seafarer to attend recognized courses. The costs of attending such courses will be borne by the seafarer. However, the owner will assist the seafarer in obtaining equivalent certificates from any foreign maritime administration with which the ship is registered and will pay the applicable fee(s) for certificates obtained.

2.4     Owners who are direct employers or who use seafarers recruitment and placement services shall ensure, as far as practicable, that the standards laid down in the Maritime Labour Convention 2006 are met including the requirement that no fees or visa costs are borne directly or indirectly, in whole or in part, by the seafarer for finding employment, the right for the seafarer to inspect his employment agreement and seek advice before engagement and preventing the recruitment or placement services from using means, mechanisms or lists to prevent the seafarers from gaining employment for which he is qualified.

## 3. Probationary Service

3.1     The period of probationary service shall be the period specified in Box 1. The probationary period shall only apply during the first term of employment with the company and shall be one third of the contract length but in any case, no more than 90 days. Both the seafarer and the owner shall be entitled to terminate this contract during this period in which event the cost of repatriation shall be the responsibility of the party giving notice of termination and compensation for premature termination of employment as provided for in Article 19.4 shall not apply. The probationary period shall not apply to Personnel/Seafarers previously engaged by the Owners within a 1 [one]-year period prior to being re-hired.

3.2     Both the Personnel/Seafarer and the Owner shall be entitled to terminate this contract during this period by giving 14 days' written notice in which event the cost of repatriation shall be the responsibility of the party giving notice of termination and compensation for premature termination of employment as provided for in Article 19.4 shall not apply.

3.3     If the seafarer is considered to be more suitable in a lesser rank then, subject to mutual agreement in writing between the owner and the seafarer, he may be demoted and placed on wages commensurate with that lesser rank.

## 4. Non-Seafarers Work

4.1     Neither the seafarer nor anyone else on board whether in permanent or temporary employment by the owner shall carry out cargo handling or other work traditionally or historically carried out by dock workers without the prior agreement of the ITF Dockers Union or ITF Union(s) concerned and then only with his consent. The seafarer shall be adequately compensated for any such work carried out. The definition of "cargo handling" may include but is not limited to: loading, unloading, stowing, unstowing, pouring, trimming, classifying, sizing, stacking, unstacking as well as composing and decomposing unit loads; and also services in relation to cargo or goods, such as tallying, weighing measuring, cubing, checking, receiving, guarding, delivering, sampling and sealing, lashing and unlashing.

4.2     Any such work performed during the normal working week as specified in Article 6 shall, in addition to basic pay, be compensated for by payment at the overtime rate specified in Box 20 for each hour or part thereof that the work is carried out. If performed outside the normal working week, such work will be compensated for at double the overtime rate.

4.3     In any port where an official trade dispute involving an ITF-affiliated dock workers' union is taking place, neither the seafarers nor anyone else on board whether in permanent or temporary employment by the owner shall undertake cargo handling or other work, traditionally or historically carried out by members of that union which would interfere with the resolution of that dispute. The owner will not take any punitive measures against any seafarer who respects such dock workers' trade dispute and any such lawful act by the seafarer shall not be treated as any breach of the seafarer's contract of employment, provided that this act is lawful within the country it is taken.

## 5. Period of Engagement

5.1     The maximum service shall be for the number of months (and the extension/reduction) indicated in Box 2. Such service may be extended or reduced within the permissible limits [Box 2] at the sole discretion of the owner for operational convenience. In exceptional circumstances, the owner may extend this period beyond the permissible limit provided that the owner undertakes to ensure that all efforts will be made to sign off and repatriate the seafarer at the earliest opportunity on completion of such period.

5.2     The owner may contract the seafarer for a period shorter than that indicated in Box 2 which period shall be indicated in the Contract of Employment.

5.3     For Hotel Personnel, special conditions may apply to Departmental Heads, Supervisors and Personnel in Groups C, D & E.

## 6. Hours of Duty

**6.1** The normal hours of duty per week are as specified in Box 3.

**6.2** Hotel Personnel are divided into four groups: A,B,C and D. Group A is not covered by the work hour limitation. For Groups B, C, and D, the Total Monthly Guaranteed Wage (Box 20) includes Basic wages for a forty-hour week, Compensation for work between forty and fifty-six hours per week and Guaranteed Overtime per month of sixty point sixty-two hours.

**6.3** A watch list shall be made available showing the working hours for all Personnel on board that are covered by this Agreement as per ILO / MLC 2006 requirements

## 7. Overtime for Officers and Hotel personnel (Group A)

**7.1** The officer is required to carry out watch keeping duties at sea and in port as is customarily required (Article 14 below), and to perform such duties and services as are necessary.

**7.2** The monthly lump sum for overtime indicated in Box 20 is full compensation for any and all overtime work done in any month (pro rata for shorter periods).

## 8. Overtime for Rating and Hotel personnel as applicable from group B,C &D.

**8.1** Qualified ratings are required to carry out watch keeping duties at sea and in port as is customarily required (Article 14 below) and to perform such duties and services as are necessary.

**8.2** The rating's overtime rate is given in Box 20 and is dependant upon rank. The guaranteed overtime hours specified in Box 4a and Box 4b must be worked in full before the hourly overtime rate will become applicable. In the event of service for a period of less than thirty days, guaranteed overtime shall be paid pro rata to the period served whether worked or not.

**8.3** Overtime hours must be approved by the Master and shall be recorded in writing per rating and in duplicate either by the Master or the person assigned by the Master. Both copies must be signed by the rating and the Master and/or the person assigned by the Master, after which the record shall be deemed final. One copy shall be handed over to the rating at the end of each month.

**8.4** Any additional hours worked during an emergency directly affecting the immediate safety of the ship, its passengers, crew or cargo (of which the Master shall be the sole judge) or for safety drills or work required to give assistance to other ships or persons in immediate peril shall not count as overtime.

## 9. Rest Periods

**9.1** The seafarer shall have a minimum of 10 hours rest in any 24 hour period and 77 hours in any seven-day period.

**9.2** This period of 24 hours shall begin at the time the seafarer starts work immediately after having had a period of at least 6 consecutive hours off duty.

**9.3** The hours of rest may be divided into no more than two periods, one of which shall be at least 6 hours in length, and the interval between consecutive periods of rest shall not exceed 14 hours.

**9.4** A table detailing the schedule of service at sea and in port and the minimum hours of rest for each shipboard position shall be posted in an accessible place on board the ship in English and the common language of the seafarers on board.

**9.5** Nothing in this article shall be deemed to impair the right of the Master of a ship to require a seafarer to perform any hours of work necessary for the immediate safety of the ship, persons on board or cargo, or for the purpose of giving assistance to other ships or persons in distress at sea. In such situation, the Master may suspend the schedule of hours of work or hours of rest and require a seafarer to perform any hours of work necessary until the normal situation has been restored. As soon as practicable after the normal situation has been restored, the Master shall ensure that any seafarers who have performed the work in a scheduled rest period are provided with an adequate period of rest. In addition, the STCW requirements covering overriding operational conditions shall apply.

**9.6** Emergency drills and drills prescribed by national laws and regulations and by international instruments shall be conducted in a manner that minimizes the disturbance of rest periods and does not induce fatigue.

**9.7** A short break of less than 30 minutes will not be considered a period of rest.

**9.8** The allocation of periods of responsibility on UMS Ships, where a continuous watch keeping in the engine room is not carried out, shall also be conducted in a manner that minimizes the disturbance of rest periods and does not induce fatigue and an adequate compensatory rest period shall be given if the normal period of rest is disturbed by call-outs to work.

**9.9** Records of seafarers daily hours of rest shall be maintained to allow for monitoring of compliance with this article. The seafarers shall receive a copy of the records pertaining to them which shall be endorsed by the master, or a person authorized by the Master, and by the seafarers.

### 10. Wages

**10.1** Gross wages shall commence on the date specified in Box 6 and terminate on the date of signing off inclusive. In case remuneration commence on the date seafarer joins the vessel, basic wages [Box 20] are payable to the seafarer for the travel period from the place of engagement to the ship. On signing off basic wages [Box 20] are payable to the seafarer for the travel period from the ship to the place of engagement, except in circumstances detailed in Articles 19.2.2 and 19.6.2.

**10.2** The wages of the seafarer shall be calculated in accordance with this Agreement and the only deductions from such wages shall be proper statutory or other deductions as recorded in this Agreement and deductions as authorized by the seafarer.

**10.3** The seafarer shall normally be paid all wages due to him at the end of each calendar month. He may, however, draw cash advances twice a month, such advances not exceeding earned wages. Any wages not so drawn shall accumulate for his account at the end of each month. The seafarer's wages net of deductions shall be paid on board the ship in arrears at month end and at final pay off:

**10.3.1** in cash in US Dollars in countries where it is legally permitted and feasible to do so, or

**10.3.2** in a currency agreed with the seafarer,

**10.3.3** together with an account of his wages identifying the exchange rate where applicable.

**10.4** The seafarer may, however, request the owner to pay the final balance of wages to a nominated bank account.

**10.5** For the purpose of calculating wages, a calendar month shall be regarded as having 30 days.

**10.6** Neither the owner nor the agent shall be responsible for the payment of any income tax or other statutory or compulsory deductions from wages or upon allotments remitted to the seafarer's nominee [Article 11.1].

**10.7** It is agreed and understood that Personnel/Seafarers occupying positions in temporary relief capacity will not earn the same rate of wages as Personnel/Seafarers occupying the same positions in a permanent capacity. However, the wages of Personnel/Seafarers occupying positions in temporary relief capacity will not earn less than the wages for the position stipulated in the attached Wage Scale.

**10.8** Wages for Hotel Personnel include compensation for irregular working hours and work on Saturdays, Sundays and public holidays.

### 11. Allotments

**11.1** The owner undertakes, if the seafarer so wishes, on a monthly fixed payment basis or as a single payment, to remit an amount up to the balance of earned wages, after statutory, compulsory and other agreed deductions have been made, to any suitable bank account nominated in writing to the owner by the seafarer or directly to the persons nominated by the seafarers, banking infrastructure and foreign exchange laws permitting.

**11.2** The owner cannot establish fixed or term deposits on behalf of the seafarer (As per Box 7 -- Part I).

### 12. Leave

**12.1** The seafarer's entitlement to leave wages shall commence from the date the seafarer joins the ship and shall be calculated in accordance with Box 20. Payment shall be made at month end or pro rata for periods shorter than 1 month.

**12.2** Boxes 7 and 8 specify respectively officer and rating leave days applicable per month of on board service and pro rata for shorter periods.

**12.3** Prior to signing off on leave, the seafarer must inform the agent of his date of availability to rejoin. Compliance with this requirement is mandatory if the seafarer wishes to be reassigned promptly to another ship on completion of earned leave.

**12.4** If the seafarer so desires, shore leave may be taken during the currency of his sea service provided that it is at all times understood and agreed by the seafarer that

**12.4.1** the granting of such leave is subject to the overriding requirement to maintain the proper and safe working of the ship;

**12.4.2** the Master is obliged to ensure that the ship is safely manned prior to granting shore leave to the seafarer.

**12.5** If the seafarer, on recovering fully from any sickness and/or injury indicates his availability to rejoin either to the agent or its manning agent he shall, if engaged, carry out a full term of service as appropriate to the ship.

## 13. Subsistence

**13.1** During a seafarer's engagement, when food and/or accommodation is not provided on board the owner shall be responsible for providing food and/or accommodation of suitable quality ashore.

**13.2** For Deck & Engine crew only for each day of leave, the company recognizes a daily amount of USD 18.

## 14. Watch keeping and other duties

**14.1** Watch keeping at sea and, when deemed necessary, in port, shall be organized where possible on a three-watch basis.

**14.2** The Master shall have sole discretion to decide when and whether the seafarer is put on watch and/or on day work.

**14.3** The Master and Chief Engineer shall not normally be required to stand watches.

**14.4** The Master shall assign GMDSS duties to the officer certificated and trained in the use of the equipment. The wages in force [Box 20] cover all GMDSS duties without extra compensation.

**14.5** Assistance in mooring is required of engine crew.

## 15. Manning

**15.1** The ship shall be competently and adequately manned so as to ensure its safe operation and the maintenance of a three watch system whenever required and in no circumstances shall it be manned at a level lower than that required by relevant and applicable international laws, rules and regulations.

**15.2** The agreed manning shall not include any temporary or riding squad workers. However, in certain circumstances, the owner and the agent can agree that for a limited period temporary riding squads may be used on board subject to the following principles:

**15.2.1** persons engaged for security purposes should not undertake other seafarers' duties;

**15.2.2** only specific tasks authorized by the master can be carried out by the riding squads;

**15.2.3** classification societies are to be informed of any survey or structural work carried out in compliance with IACS UR Z13;

**15.2.4** all riding squads, if directly employed by the owner or the agent, must be covered by agreements in line with ILO conventions and recommendations;

**15.2.5** riding squads should not be used to replace current crew or be used to undermine ITFagreements.

**15.3** In addition, the manning of the ship shall be determined following agreement between the owner and the ITF affiliate with whom the agreement is concluded.

**15.4** The owner and the agent retain the option of transferring the seafarer from the ship to another in order to facilitate fleet operations. Any such transfer will not involve loss of rank, position or wage to the seafarer, and the total period of employment shall not exceed that stipulated in the contract of employment. All costs and subsistence for and during the transfer shall be for the account of the owner.

**15.5** If the seafarer is assigned temporarily to a higher rank to fill a vacancy he will be paid the wages [Box 20] of the higher rank pro rata for the duration of his new assignment. The Master will notify the seafarer that the promotion is of a temporary nature and that he will revert to his original rank when the vacancy is filled.

## 16. Shorthand Manning

**16.1** The seafarers required to carry out additional duties due to a falling short in manning levels shall share the basic wages and paid leave of the category which has fallen short and to which the additional duties relate (subject to the proviso in Article 15.2) pro rata for the duration of the carrying out of such additional duties. The owner shall make every effort to make up the shortage before the ship leaves the next port of call. This provision shall not affect any overtime to be paid in accordance with Articles 7 and 8 above.

**16.2** However, regardless of any additional duties carried out, shorthand wages are payable for the duration of the shortage only if replacement of the category fallen short is not made within 14 days or by the next port of call, whichever is the later.

## 17. Service in Warlike Operations Areas/ High Risk Areas

**17.1** A Warlike Operations area shall be determined by the ITF. The company shall regularly receive from the respective ITF constituent information on Warlike Operations areas. An updated list of ITF Warlike Operations areas shall be kept on board the vessel and shall be accessible to the crew.

**17.2** At the time of the assignment the company shall inform the seafarers if the vessel is bound to or may enter any warlike operations area. If this information becomes known during the period of the seafarers' employment on the vessel the company shall advise the seafarers immediately.

**17.3** If the vessel enters a Warlike Operations area:

- The seafarer shall have the right not to proceed to such area. In this event the seafarer shall be repatriated at company's cost with benefits accrued until the date of return to his/her home or the port of engagement.

- The seafarer shall be entitled to a double compensation for disability and death.

- The seafarer shall also be paid a bonus equal to 100% of the basic wage for the durations of the ship's stay in a warlike operations area – subject to a minimum of 5 days pay.

- The seafarer shall have the right to accept or decline an assignment in a warlike operations area without risking loosing his/her employment or suffering any other detrimental effects.

**17.4** In addition to areas of warlike operations, the ITF may determine High Risk Areas and define, on a case-by-case basis, the applicable seafarers' benefits and entitlements, as well as employers' and seafarers' obligations. In the event of any such designations the provisions of Articles 17.1 and 17.2 shall apply. The full details of any areas so designated shall be attached to the CBA and made available on board the vessel.

**17.5** In case a seafarer may become captive or otherwise prevented from sailing as a result of an act of piracy or hijacking, irrespective whether such act takes place within or outside ITF designated areas referred to in this article, the seafarer's employment status and entitlements under this agreement shall continue until the seafarer's release and thereafter until the seafarer is safely repatriated to his/her home or place of engagement or until all company's contractual liabilities end. These continued entitlements shall, in particular, include the payment of full wages and other contractual benefits. The company shall also make every effort to provide captured seafarers, with extra protection, food, welfare, medical and other assistance as necessary.

## 18. Seafarer's Personal Effects

18.1    When travelling by air at the owner's expense to/from the ship the seafarer is required to limit the weight of his baggage to the maximum free allowance permitted by the airline. Excess baggage charges, if any, will be borne by the seafarer.

18.2    The owner will pay compensation for proven losses up to the maximum amount specified in Box 9 if the seafarer suffers loss of, or damage to, his personal effects as a result of wreck, loss, stranding or abandonment of the ship or as a result of fire, flooding or collision, excluding any loss arising from the seafarer's own fault or through theft or misappropriation.

18.3    Payment of compensation for loss of effects is conditional upon the submission by the seafarer to the owner of a written declaration countersigned by the Master, listing and attributing reasonable values to the effects lost. The definition of effects includes clothes, documents, navigation and other technical instruments and tools necessary to the trade of the seafarer but not jewellery.

18.4    The owner shall take measures for safeguarding property left on board by any sick, injured or deceased seafarer and for returning it to him or to his next of kin.

## 19. Termination of Seafarer's Employment

19.1    The seafarer's employment is summarily terminated:

19.1.1    immediately upon repatriation at the expiry of the agreed period of service stipulated in the contract of employment or upon repatriation at the end of any extension or reduction in the duration of service [Article 5.1];

19.1.2    if the seafarer is signed off and repatriated owing to sickness or injury following medical examination in accordance with Article 22.

19.2    The owner may terminate the seafarer's employment with immediate effect:

19.2.1    without reason on payment of severance pay in accordance with Article 19.4;

19.2.2    in the event of serious default of employment obligations in accordance with Article 21 below;

19.2.3    in the event that the seafarer fails the owner's drug and alcohol test;

19.2.4    in the event of the total loss of the ship or if the ship has been laid up for a continuous period of at least one month or if the ship is sold.

19.3    The seafarer may terminate employment:

19.3.1    by giving 14 days notice during the first 90 days thereafter one month's written notice of termination to the owner or the Master;

19.3.2    if during the course of a voyage it is confirmed that the spouse or partner previously nominated by the seafarer at the time of joining the ship, or in the case of a single person, a parent, has fallen dangerously ill or has died;

19.3.3    if the ship is about to sail into a warlike operations area, in accordance with Article 18 of this Agreement;

19.3.4    if the seafarer was employed for a specified voyage and the voyage is subsequently altered substantially, either with regard to duration or trading pattern;

19.3.5    if the ship is certified substandard in relation to the applicable provisions of the Safety of Life at Sea Convention (SOLAS) 1974, the International Convention on Loadlines (LL) 1966, the Standards of Training Certification and Watchkeeping Convention (STCW) 1995, the International Convention for the Prevention of Pollution from Ships 1973, as modified by the Protocol of 1978 (MARPOL) or substandard in relation to ILO Convention No. 147, 1976, Minimum Standards in Merchant Ships as supplemented by the Protocol of 1996 and remains so for a period of 30 consecutive days provided that adequate living conditions and provisions are provided on board or ashore. In any event the ship shall be regarded as substandard if it is not in possession of the certificates required under either applicable national laws and regulations or international instruments;

19.3.6    if the ship has been arrested and has remained under arrest for 30 days;

19.3.7    if after any agreed grievance procedure has been invoked, the owner has not complied with the terms of this Agreement.

**19.3.8** THIS SUB-ARTICLE FOR HOTEL PERSONNEL ONLY: To preserve the Owners' and Agent's rights [in conformity with police/immigration rules and regulations of various countries] - in the case of personnel signing off at their own request or on account of dismissal from service before the termination of contracted period of service on board – Hotel Personnel may be asked at the Owners' discretion for a cash deposit or a withholding from their wages an amount equal to the estimated cost of repatriation and the cost of securing replacement in the event of early termination of the stipulated period of service. This deposit is refundable in full on completion of the agreed period of service.

**19.4** Unless otherwise qualified in Part I or elsewhere in this Agreement, on termination of employment, the seafarer shall be entitled to receive compensation of:

**19.4.1** two months' basic pay (Articles 19.2.1 and 19.2.4, 19.3.4 to 19.3.7 above) or

   **19.4.2** 100 days' basic pay (Article 24.1.3)

   **19.4.3** provided that if the seafarer's contract is otherwise due to expire within periods specified in Articles 19.4.1 or 19.4.2 as applicable or period stipulated elsewhere in this Agreement, he/she shall be entitled to be paid basic wages for the unexpired period of the contract only.

**19.5** It shall not be a ground for termination if, during the period of engagement and in accordance with Article 15.4 above, the seafarer is transferred to another ship belonging or related to the owner or agent.

**19.6** The seafarer's employment shall terminate with immediate effect:

   **19.6.1** if he absents himself from the ship without authorized leave, or

   **19.6.2** on the date of sign off if the seafarer decides, for his own reasons, to visit and/or reside in any other place prior to returning to his place of engagement, in which case the owner and the agent shall not in any way be liable for death or disability claims or any other claims arising directly or indirectly from the decision of the seafarer and the owner's responsibility shall be limited solely to providing an airline ticket to the seafarer to cover his repatriation from the port of disembarkation to the place of engagement.

**19.7** If the seafarer absents himself from the ship without authorized leave, the owner may retain any balance of wages due to the seafarer or such documents as necessary until restitution of all expenses has been made by the seafarer including but not limited to the costs of engaging and placing on board a substitute.

## 20. Repatriation

**20.1** Repatriation shall take place in such a manner so as to take into account the needs and reasonable requirements for comfort of the seafarer.

**20.2** Owners shall shoulder all travel / airline costs to/from the seafarers' home unless termination of employment arises under Articles 19.2.2, 19.2.3, 19.3.1, 19.6.1 or 21.2 in line with the MLC 2006.

**20.3** Repatriation under Article 19.3.2 is subject to the ship being able to comply with its flag state safe manning regulations or if the ship is unable to sail for lack of a suitable reliever.

**20.4** During repatriation, the owner shall be liable for the following costs:

   **20.4.1** payment of basic wages when applicable as per Article 10.1 above;

   **20.4.2** the cost of maintaining the seafarer (including subsistence) ashore until repatriation takes place;

   **20.4.3** transportation of the seafarer's personal effects as per Article 18.1 above.

**20.5** The seafarer shall not be entitled to repatriation at the owner's expense if termination of employment arises under Articles 19.2.2, 19.2.3, 19.3.1, 19.6.1 or 21.2.

## 21. Discipline

**21.1** Formal procedures covering shipboard discipline are separately detailed under Article 36 of this Agreement.

**21.2** The owner may terminate the employment of the seafarer in the event of serious default of employment obligations giving rise to a lawful entitlement to dismiss him, provided that the owner shall, where possible, prior to dismissal, give written notice to the seafarer specifying the serious default of employment obligations giving rise to dismissal.

**21.3** Other than in circumstances described in Article 19.7, in the event of dismissal of the seafarer, the owner

shall be entitled to deduct from wages accrued due the costs of repatriation together with any costs incurred by the owner as are directly attributable to the seafarer's serious default of employment obligations. Such costs will not include the costs of providing a replacement for the seafarer.

**21.4** Refusal by the seafarer to obey an order to sail with the ship shall not amount to a breach of the employment obligations of the seafarer where:

    **21.4.1** the ship is unseaworthy or otherwise substandard as defined in Article 19.3.5; or

    **21.4.2** for any reason it would be unlawful for the ship to sail; or

    **21.4.3** the seafarer has a genuine grievance against the owner in relation to the implementation of this Agreement and has complied in full with the terms of the owner's/agent's grievance procedure; or

    **21.4.4** the seafarer refuses to sail into an area of warlike operations.

**21.5** Nothing contained in this Agreement is intended or shall be construed so as to restrict in any way the lawful authority of the Master or so as to give to the seafarer cause or excuse for refusing or failing to carry out the lawful order of any superior.

**21.6** The seafarer agrees to comply with the owner's and/or agent's quality management policies and procedures for the safe and efficient running of the ship.

## 22. Medical Attention

**22.1** The seafarer shall be entitled to immediate medical attention when required and dental treatment of acute pain and emergencies. He shall conform to the law of the country applicable in ports of call concerning vaccination, inoculation and any other health requirements to enable the ship to obtain port health clearance. He will observe precautions against sickness as requested by the Master, and take medicines as prescribed.

**22.2** Emergency dental services shall be provided to the seafarer. Such services comprising extraction, amalgam filling, x-ray and general attention and care of mouth infections shall be performed only by licensed dentists appointed by the owner. The owner will bear the costs of such services. Artificial aids and cosmetic dental treatment like gold filling, porcelain caps, etc. are excluded under these provisions.

**22.3** If the seafarer is signed off due to sickness or injury he shall be entitled to medical attention (including hospitalization) at the owner's expense until he has been repatriated. If and when declared fit for duty the seafarer may be required, at the owner's discretion and for the owner's account, to rejoin the ship from the port of disembarkation to complete the remaining period of his contract or to be repatriated to his place of engagement.

**22.4** If the seafarer is unfit as a result of sickness or injury and is repatriated, he shall be entitled to medical attention (including hospitalization) at the owner's expense:

    **22.4.1** in the case of sickness, for up to 130 days after initial hospitalization, subject to the submission to the owner of satisfactory medical certificates;

    **22.4.2** in the case of injury (other than self-inflicted injuries or injuries caused by the willful act of the seafarer), for so long as medical attention is required or until a medical determination is made in accordance with Article 25.2 concerning permanent disability, whichever is the sooner;

    **22.4.3** provided however, that the seafarer reports as soon as possible upon repatriation to the agent's manning agent who will arrange medical attention promptly. Where the nature of sickness or injury inhibits the seafarer from reporting to the manning agent it is incumbent upon the seafarer to notify them in writing accordingly so that alternative arrangements can be made for medical treatment. Failure by the seafarer to avail himself of the treatment offered will release the owner from any liability to the seafarer in respect thereof.

    **22.4.4** In those cases where, following repatriation and having fulfilled the requirements of Article 22.4.3, seafarers have to meet their own medical care costs, in line with Article 22.4.1, they may submit claims for reimbursement within 3 months, unless there are exceptional circumstances, in which case the period may be extended.

**22.5** Proof of continued entitlement to medical attention shall be by submission of satisfactory medical reports, endorsed where necessary, by a company appointed doctor. If a doctor appointed by or on behalf of the seafarer disagrees with the assessment, a third doctor may be nominated jointly between the company and the union and the decision of this doctor shall be final and binding on both parties.

### 23. Sick Pay

**23.1** Sick pay is calculated at the rate of the seafarer's basic wage or else stipulated otherwise for vessels under a specific agreement with ITF (Pls see MOU when applicable).

**23.2** If the seafarer is discharged and landed at any port because of sickness or injury, he is entitled to receive sick pay plus guaranteed overtime or, in the case of officers, fixed overtime, until he has been repatriated at the owner's expense. Thereafter he shall be entitled to sick pay as follows:

**23.2.1** in the case of sickness, for up to 130 days after discharge, subject to the submission of valid medical certificate, without undue delay.

**23.2.2** in the case of injury (other than self-inflicted injuries or injuries caused by the willful act of the seafarer), for so long as medical attention is required or until a medical determination is made in accordance with Article 25.2 concerning permanent disability, whichever is the sooner;

**23.2.3** provided however, that the seafarer reports as soon as possible upon repatriation to the agent's manning agent who will arrange such medical attention promptly. Where the nature of sickness or injury inhibits the seafarer from reporting to the manning agent it is incumbent upon the seafarer to notify them in writing accordingly so that alternative arrangements can be made for medical treatment. Failure by the seafarer to avail himself of the treatment offered will release the owner from any liability to the seafarer in respect thereof.

**23.3** The submission of satisfactory medical certificates endorsed, where necessary, by the owner's approved doctor, shall be considered proof of continuing entitlement to sick pay. If a doctor appointed by or on behalf of the seafarer disagrees with the assessment, a third doctor may be nominated jointly by the owner and the seafarer and the decision of this doctor shall be final and binding on both parties.

### 24. Maternity

**24.1** In the event that the seafarer becomes pregnant during the period of employment:

**24.1.1** she shall advise the Master as soon as the pregnancy is confirmed;

**24.1.2** the owner will repatriate her as soon as reasonably possible but in any case earlier than the 26th week of pregnancy; and at the first port of call in circumstances where the nature of the ship's operations could be hazardous.

**24.1.3** she shall be entitled to 100 days basic pay in accordance with Article 19.4 above

**24.2** On reporting for duty within 3 years after childbirth, the seafarer shall be offered the same or equivalent position provided such vacancy exists and provided her certificates and competency skills have been upgraded according to regulations current.

### 25. Disability

**25.1** If the seafarer suffers permanent disability while in service on board the ship, or while travelling to or from the ship, as a result of an accident, regardless of fault, but excluding injuries and consequent disability caused by his wilful act, and provided that his ability to work as a seafarer is consequently reduced, he shall be entitled to compensation in addition to his sick pay according to the provisions hereof.

**25.2** The percentage degree of permanent disability suffered by the seafarer shall be determined by the owner's approved doctor and in accordance with the scale in Box 12. The owner shall pay that proportion of maximum disability compensation applicable to the rank of the seafarer corresponding to the percentage degree of disability so established.

**25.3** Depending upon whether the seafarer is an officer or a rating or a hotel personnel (Group A, B, C, D), the compensation provided under this article for 100 % disability shall not exceed the maximum limits specified in Boxes 10A and 10B for officers and in Box 11 for ratings and Hotel personnel. Lesser degrees of disability shall be compensated for proportionate to the maximum limit applicable.

**25.4** If the seafarer is assessed at 50% disability in accordance with Article 25.2, or assessed at less than 50% disability but certified as being permanently unfit for further sea-service in any capacity by the owner's approved doctor he shall be regarded as being permanently unfit for sea-service in any capacity. Depending upon whether he is an officer or a rating he will be entitled to compensation at the relevant maximum limit specified in Article 25.3.

**25.5** If a doctor appointed by or on behalf of the seafarer disagrees with the assessment of the owner's

approved doctor in Articles 25.2 or 25.4, a third doctor may be nominated jointly by the owner and the union and the decision of this doctor shall be binding on both the parties.

**25.6** Any payment effected under this article shall be without prejudice to any claim for compensation made in law provided that it shall be deducted from any award of damages.

**25.7** The owner, in discharging his responsibilities to provide for safe and decent working conditions, should have effective arrangements for the payment of compensation for personal injury. When a claim arises, payment should be made promptly and in full, and there should be no pressure by the owner or by the representative of the insurers for a payment less than the contractual amount due under this Agreement. Where the nature of the personal injury makes it difficult for the owner to make a full payment of the claim, consideration should be given to the payment of an interim amount so as to avoid undue hardship.

## 26. Loss of Life/Death in Service

**26.1** If the seafarer dies whilst in service on board the ship, including death whilst travelling to and from the ship, or as a result of a marine or other similar peril, but excluding death due to willful act, neglect or misbehavior on the part of the seafarer, the owner shall pay the sums referred to below (Articles 26.1.1 and 26.1.2) to the seafarer's nominated next of kin and to each dependent child under the age specified in Box 15 up to a maximum of the number of children specified in Box 16, subject to the conditions in Article 2.2. If the seafarer has no next of kin, the aforementioned sum shall be paid to the person or body empowered by law or otherwise to administer the seafarer's estate.

    **26.1.1** To the nominated next of kin - as per Box 13.

    **26.1.2** To each dependent child - (subject to the maximum number as above) as per Box14.

**26.2** Any payment effected under this article shall be without prejudice to any claim for compensation made in law provided that it shall be deducted from any award of damages.

**26.3** It is agreed that upon the request of the next of kin of the seafarer should he die in a foreign port, the owner shall assume the obligation for and pay all costs in connection with the return of the seafarer's body to his home as well as burial expenses subject to any local or other Government restrictions or regulations which prevent the owner from doing so. If the seafarer dies at sea, the owner shall return the body to his home, unless the Master determines that this would impair the health or welfare of the crew.

**26.4** The provisions of Article 25.7 above shall also apply in the case of compensation for Loss of Life/Death in Service as specified in this article.

## 27. Insurance Cover

**27.1** The owner shall arrange appropriate insurance to cover itself against potential risks and liabilities arising under this Agreement.

## 28. Food, Accommodation, Bedding, Amenities etc.

**28.1** The owner shall provide, as a minimum, accommodation, recreational facilities and food and catering services in accordance with the standards specified in Title 3 to the ILO Maritime Labour Convention 2006 and shall give due consideration to the Guidelines in that Convention.

**28.2** The accommodation standards should generally meet those criteria contained in relevant ILO instruments relating to crew accommodation.

**28.3** All stores and provisions are for use and consumption on board the ship and any unused or unconsumed stores and provisions remain the property of the owner. If the seafarer takes ashore, sells or destroys such stores or provisions he shall be subject to disciplinary action and liable for the full cost of the stores and provisions.

**28.4** The seafarer shall keep his accommodation and common areas and washrooms clean, tidy, and ready for inspection by the Master or the officer deputed for this purpose. Prior to disembarkation, the seafarer shall

leave his quarters in a clean and orderly condition to the satisfaction of the Master or the deputed officer. The effort/work thus involved does not qualify for overtime payment.

28.5 The seafarer will have access to free telephone calls on a one-off basis due to compassionate circumstances as per Article 19.3.2 above.

## 29. Personal Protective Equipment

29.1 The owner shall provide the seafarer with personal protective equipment in accordance with ISM/IMO/MLC 2006 regulations and documented procedures, if any, that specify the requirement for additional equipment.

29.2 The owner will supply the seafarer with appropriate personal protective equipment for the nature of the job.

29.3 The seafarer will be advised of the dangerous nature and possible hazards of any work to be carried out and instructed as to any necessary precautions to be taken and on the use of protective equipment.

29.4 If the necessary safety equipment is not available to operate in compliance with any of the above regulations, the seafarer will not be permitted or requested to perform the work.

29.5 The seafarer must make use of and take care of personal protective equipment at his disposal and shall not misuse any means provided for his protection or the protection of others. Personal protective equipment remains the property of the owner.

## 30. Shipboard Safety Committee

30.1 The owner shall facilitate the establishment of an on board Safety and Health Committee, in accordance with the provisions contained in the ILO Code of Practice on Accident Prevention on Board Ship at Sea and in Port, and as part of the safety management system as per the requirements of the ISM Code and MLC 2006.

30.2 The owner shall provide a link between with those on board through the designation of a person or persons ashore having direct access to the highest level of management as per the requirements of the ISM code. The owner shall also designate an on board competent safety officer who shall implement their safety and health policy program and carry out the instructions of the Master to:

   30.2.1 improve the crew's safety awareness;

   30.2.2 investigate any safety complaints brought to her/his attention and report them to the safety and health committee and the individual, where necessary;

   30.2.3 investigate accidents and make the appropriate recommendations to prevent the recurrence of such accidents; and

   30.2.4 carryout safety and health inspections.

   30.2.5 Encourage near-miss reporting and carefully implement safety compliance initiatives.

30.3 The owner acknowledges the right of the crew to elect a safety representative to the on board safety and health committee. Such a representative shall be entitled to the same protections as the liaison representative as provided for in Article 31.5 below.

## 31. Membership Fees, Welfare Fund and Representation of the Seafarers

31.1 Subject to national legislation, in order to be covered by this Agreement the seafarer shall be a member of the union affiliated to the ITF. Welfare / other contributions payable to the union, if any, whether from the seafarer or the owner are given in Box 17.

31.2 The owner shall arrange to pay in respect of the seafarer the entrance/membership fees (Box 18) in accordance with the terms of the relevant organization.

31.3 The owner shall pay contributions to the ITF Seafarers' International Assistance, Welfare and Protection Fund in accordance with the terms of the ITF Special Agreement.

31.4 The Owner acknowledges the right of the seafarer to participate in union activities and to be protected against acts of anti-union discrimination as per ILO Conventions Nos. 87 and 98.

**31.5** The owner acknowledges the right of the seafarer to elect a liaison representative from among the crew who shall neither be dismissed nor be subject to any disciplinary proceedings as a result of his duties as a liaison representative unless the agreed grievance procedure has been observed and the union has been given adequate notice of the dismissal.

## 31. Equality

**31.1** The seafarer shall be entitled to work, train and live in an environment free from harassment and bullying whether sexually, racially or otherwise motivated. Any such behaviour on the seafarer's part will be regarded as serious default of employment obligation.

## 33. Waivers and Assignments

**33.1** The owner undertakes not to demand or request the seafarer to enter into any document whereby, by way of waiver or assignment or otherwise, the seafarer agrees or promises to accept variations to the terms of this Agreement or, except as provided in this Agreement, return to the owner, its servants or agents any wages (including back wages) or other emoluments due or becoming due to the seafarer under this Agreement and the owner agrees that any such document already in existence shall be null and void and of no legal effect.

## 34. Amendment of the Agreement

**34.1** This agreement shall commence and remain in effect as provided in Part I.

## 35. Validity and amendment of the agreement

**35.1** This Agreement shall commence and remain in effect as provided in Part I.

Date: January 1st, 2013

For V.Ships Leisure Inc.
as Managers or agents on behalf of the Owners

For FIT/CISL – Rome
International Personnel/Seafarers Dept.

---

Mr. Raphael Sauleau
Crew Operations Director
V.Ships Leisure Inc.

As Managers or Agents on behalf of the Owners

or employers.

---

Mr. Remo Di Fiore
The National Responsible

# 36. FORMAL PROCEDURES RELATING TO ON BOARD DISCIPLINE AND ADHERENCE TO EMPLOYMENT OBLIGATIONS

## 1 - GENERAL GUIDELINES

Disciplinary procedures are designed to emphasise and encourage improvement in an individual's conduct and performance as well as to ensure the safe and efficient operation of the Ship.

The following guidelines should be read in conjunction with disciplinary procedures embodied in the terms and conditions of employment for a particular nationality and the relevant flag state requirements.

## 2 - DEALING WITH DEFAULT OF EMPLOYMENT OBLIGATIONS

A Seafarer who is alleged to have committed an act of default of employment obligations or deemed to be under performing will be seen in the first instance by the Chief Officer or Chief Engineer (as appropriate). If the head of department is satisfied that no further action is required, or that an act of misconduct did occur, and calls for no more than an informal warning, then he should proceed accordingly. In the case of under-performance, it may be that additional training will provide the most effective solution.

If the offence is of a more serious nature (see 3 below) or is a repetition of similar minor offences, then the case must be referred to the Master. In dealing with such an offence the Master should observe the following general guidelines:

i) Cases referred to the Master should be handled with the minimum of delay.

ii) The Master should convene a hearing and a thorough investigation carried out. This will include, where necessary, the calling of any witnesses and the recording of their statements.

iii) The head of department should be present at a disciplinary hearing and the Seafarer has the right to be accompanied by a colleague who may advise him and speak on his behalf.

iv) After a careful and thorough investigation and having considered all the evidence, the Master will verbally inform the Seafarer whether or not he finds that he has committed the offence(s) in question.

v) Depending on the findings, the Master may dismiss the case, or issue a FORMAL WARNING FOR MISCONDUCT OR INEFFICIENCY FORM and/or dismiss the Seafarer from the Ship.

vi) Details of an offence and the action taken will be recorded in the Ship's Official Log Book.

vii) The Seafarer shall be given a copy of all entries made in the log book relating to the offence(s) for which he is subject to disciplinary action and should acknowledge receipt.

viii) If the Seafarer declines to acknowledge receipt, then a subsequent entry is made in the Ship's Official Log Book which must be witnessed by another senior officer and, if possible, by another seafarer of the same nationality.

## 3 - SERIOUS DEFAULT OF EMPLOYMENT OBLIGATIONS

The Owner considers the following to be serious default of employment obligations that may lead to dismissal from the Ship if proved, to the reasonable satisfaction of the Master, to have been committed:

i) Assault.

ii) Wilful damage to the Ship or any property on board, or unauthorised disposal of Ship's property for personal gain.

iii) Theft or possession of stolen property.

iv) Possession of weapons or explosives.

v) Persistent or wilful failure to perform duty.

vi) Unlawful possession, consumption and/or distribution of drugs.

vii) Consumption and/or bringing on board alcohol in violation of the Company's Alcohol policy.

viii) Conspiring with others at sea to impede the progress of the voyage or navigation of the Ship.

ix) To be asleep on duty or failure to remain on duty if such conduct would prejudice the safety of the Ship or any person on board.

x) To be under the influence of alcohol or drugs whether on or off duty to the extent that the safety of the Ship or any person on board is prejudiced.

xi) To smoke, use naked light or an unapproved electric torch in any part of the Ship carrying dangerous cargo or stores where smoking or the use of naked lights or unapproved torches is prohibited.

xii) Intimidation, coercion and/or interference with the work of other employees.

xiii) Behaviour which seriously detracts from the safe and/or efficient working of the Ship.

xiv) Causing or permitting unauthorised persons to be on board the Ship whilst at sea.

xv) Repeated acts of default of employment obligations, incompetence or negligence of a lesser degree after one or more warnings have been issued.

xvi) Abetting or conniving with others to smuggle or misdeclaration of, or failure to declare articles leading to seizure and/or fine to the Ship.

xvii) Absence from the Ship without authorised leave, or assisting others to so absent themselves without authorised leave.

xviii) Being left behind by the Ship.

## 4 - CONDUCT IN EMERGENCIES

In an emergency or other situation in which the safety of the Ship or of any person on board is at stake the Master, officers and senior ratings are entitled to look for immediate and unquestioning obedience of orders. There can be no exception to this rule. Failure to comply will be treated as among the most serious default of employment obligations and will lead to the offender's dismissal from the Ship at the first opportunity. Under certain flag legislation such an act of default of employment obligations may also lead to prosecution.

## CODE OF CONDUCT

1.1 Seafaring is a civilian occupation. However the ship board environment demands high standards of discipline, behaviour and conduct.
1.2 A responsible attitude to work and leisure is expected of every person working on a ship.
1.3 Disciplinary procedures are designed to emphasise and encourage improvements in individual conduct.
1.4 Failures of discipline, conduct or behaviour will be dealt with by reference to this code.
2.1 Good communication between the Master, Officers, Petty Officers and Crew will ensure that reasonable orders are given and obeyed.
2.2 In an emergency or other situation in which the safety of the ship or any person on board is at risk the orders of the Master, Officers and Petty Officers must be obeyed without question.
3.1 Immediate dismissal from the ship may be considered by the Master for serious breaches of the Code.
3.2 It must be proven to the Master's reasonable satisfaction that the offence has been committed.
3.3 All cases of dismissal are to be recorded on the Agent's disciplinary forms DIS 2 & DiS 3 and in the Official Log Book.
3.4 The following acts of misconduct are considered serious breaches of the Code.
    3.4.1 Assault of a passenger, officer, crew member or any other person on board the vessel
    3.4.2 Wilful damage to the ship or any property on board.
    3.4.3 Theft or possession of stolen property.
    3.4.4 Possession of offensive weapons, firearms or explosives.
    3.4.5 Violation of customs regulations in any port including the unlawful possession or distribution of drugs at any time.
    3.4.6 Mutiny or inciting others to mutiny.
    3.4.7 Persistent or wilful failure to perform duty.
    3.4.8 Conduct endangering the ship or persons on board.
    3.4.9 To prejudice the safety of the ship or any person on board by sleeping on duty, failing to remain on duty or incapacity to carry out duty through the influence of drink or drugs.
    3.4.10 Disobedience of orders relating to the safety of the ship or any person on board.
    3.4.11 Failure to comply with the ship's security procedures.
    3.4.12 Behaviour which seriously detracts from the safe, hygienic & efficient working of the ship or the service standards of the DK & ENG operation.
    3.4.13 Failure to follow garbage disposal procedures.
    3.4.14 Intimidation, coercion and interference with the work of others on board.
    3.4.15 The communication of written, verbal, photographic, video or computer material considered invasion of privacy of Owners'/Agent's guests, employees, activities, operations or business without the permission of the Master.
    3.4.16 Offensive or disrespectful behaviour towards a passenger.
    3.4.17 Unauthorised gaming, gambling or trading.
    3.4.18 Repeated breaches of the offences in paragraph 4.
4.1 Formal warnings may be considered by the Master or Head of Department for lesser breaches of the Code.
4.2 The Master or Head of Department must be reasonably satisfied that the offence has been proven to have been committed..
4.3 A formal warning should be recorded on the Agent's disciplinary forms and in the vessel's Official Log Book.
4.4 The following acts of misconduct are considered lesser breaches of the Code.
    4.4.1 Offences described in paragraph 3 which in the circumstances of the case do not justify dismissal. [The unlawful possession of drugs will always result in dismissal].
    4.4.2 Minor acts of assault, disobedience, negligence and neglect of duty.
    4.4.3 Remaining in passenger accommodation other than in execution of his/her duties.
    4.4.4 Unsatisfactory work performance.
    4.4.5 Poor punctuality.
    4.4.6 Stopping work before the authorised time.
    4.4.7 Failure to report to work without satisfactory reason.
    4.4.8 Absence from place of duty or from the ship without leave.
    4.4.9 Offensive, disrespectful or disorderly behaviour.
    4.4.10 Incorrect or unsatisfactory appearance or inadequate personal hygiene.
5.1 Verbal warnings may be considered by the Master, Head of Department, an officer or a petty officer for lesser breaches of the Code.
5.2 The Master or Head of Department must be reasonably satisfied that the offence has been proven to have been committed..
5.3 The recording of a verbal warning is not required and the matter will be considered closed once the verbal warning is issued.
5.4 The following acts of misconduct are considered lesser breaches of the Code.
    5.4.1 Offences described in paragraph 4. which in the circumstances of the case do not justify a formal warning.
6.1 Disciplinary hearing procedures for dealing with breaches of the Code [See also attached Shipboard Disciplinary Procedure outlined graphically.]:
    6.1.1 An alleged breach of the Code for which a verbal warning is considered inadequate is to be investigated by the Master or Head of Department with the minimum of delay.
    6.1.2 The Master or Head of Department is to advise the employee of the alleged breach of the Code on form DIS 2 and instruct him/her to attend a disciplinary hearing to investigate the matter.
    6.1.3 The employee may ask a friend to accompany him either to observe or to speak on his behalf.
    6.1.4 At the hearing the employee is to be given the opportunity to admit or deny the allegation, to question the person bringing the allegation, to call and question any witnesses on the evidence produced against him and to make a statement.
    6.1.5 After careful and thorough investigation and having considered all the evidence the Master or Head of Department will inform the employee if he finds the employee did commit the alleged breach.
    6.1.6 If the employee is found to have committed the alleged breach :
        6.1.6.1 the Master or Head of Department may impose a formal warning;
        6.1.6.2 the Master will consider the employee's record on the ship, the severity of the offence and any other relevant factors. He may then impose either a formal warning or dismiss the employee from the ship.
    6.1.7 Disciplinary action is to be recorded on Form DIS 3 and in the form of an Official Log Book entry. A copy of each is to be given to the employee.
6.2 In the event of dismissal the employee is to be advised of any repatriation expenses to be recovered from his wages and an entry to that effect made in the Official Log Book.

## NOTIFICATION OF DISCIPLINARY HEARING

Consecutive No./Year
Date: _____
Ship: _____

Today, _____     _____
*Full name*                                    *Rank*

has reported to the *Master / Staff Captain / Chief Engineer / Hotel Director that

_____     _____
*Full name*                                    *Rank*

is in breach of paragraph _____ of the Code of Conduct. Details are briefly given below:

_____
_____
_____
_____
_____

Mr./Ms. _____ is hereby advised that a disciplinary hearing will be convened by the
*Master / Staff Captain / Chief Engineer / DK & ENG Director  in  the
_____ at  _____ on  _____
*Place*                              *Time*              *Date*

to investigate the allegation and *he/she is instructed to attend the above hearing.

*He/she is invited to bring a friend to observe or speak on *his/her behalf.

*He/She is advised that if the allegation is proven, depending upon the nature of the offence and, in accordance with the provisions of the Code of Conduct, either,
- a formal warning may be imposed, or,
- *he/she may be dismissed from the ship.

I hereby acknowledge receipt of this Notification of Disciplinary Hearing.

_____
Signature of Master / Head of Department

_____          _____
Name of Master / Head of Department       Signature of the crew member and date of receipt.

Entry made in the Official Log Book *Yes/No
Original - Crew Manager
Copy    - Crew member
Copy    - Ship's file

* delete what is not applicable.

# DISCIPLINE RECORD FORM

## *FORMAL WARNING / DISMISSAL

Consecutive No./YearDate: _____
Ship: _____

Today,_____Full nameRank
was found by the *Master / Staff Captain / Chief Engineer / Hotel Director to be in breach of paragraph
_____ of the Code of Conduct. Details of the hearing are attached.

*He/She is advised that this breach of the Code of Conduct contravenes clause ..................

of the *Code of Conduct/*their Contract of Employment and that :

the *Staff Captain / Chief Engineer / HOTEL Director imposes this 1st Formal Warning

and that any further breaches of the Code of Conduct may be referred to the Master and could result in
*his/her dismissal from the ship.

the Master imposes a *1st/2nd Formal Warning and that any further breaches of the Code of Conduct will
result in *his/her dismissal from the ship.

the Master dismisses *him/her from the ship.


_____
Signature of Master / Head of Department


_____
Name of Master / Head of DepartmentI hereby acknowledge receipt of this Discipline Record Form.


_____
Signature of the crew member and date of receipt
Entry made in the Official Log Book *Yes/No

Original - Crew Manager
Copy    - Crew member
Copy    - Ship's file


* delete what is not applicable.

SHIPBOARD DISCIPLINARY PROCEDURE

Notes:
1. Heads of Department are: STAFF CAPTAIN, CHIEF ENGINEER, HOTEL DIRECTOR
2. The Staff Captain keeps all documentation.
3. Disciplinary measures can be initiated at any level of the structure depending upon the nature and severity of
the offence.

# COMPENSATION SCALE

## I. INJURIES TO EXTREMITIES

### A. Hand, Arm, Shoulder
*(If a person is left-handed, his/her left hand is assessed as right hand)*

#### a. Fingers

| | Right | Left |
|---|---|---|
| Loss of all fingers of one hand | 55 | 50 |
| Loss of one thumb and metacarpal bones | 30 | 25 |
| Loss of one thumb | 25 | |
| Loss of extremity of one thumb | 12 | |
| Loss of half of extremity of one thumb | 8 | |
| Thumb with stiff extreme joint | 5 | |
| Thumb with stiff metacarpophalangeal joint | 3 | |
| Thumb with stiff extreme and metacarpophalangeal joints | 15 | |
| Loss of forefinger (second finger) | 10 | |
| Loss of middle and extreme joints of forefinger | 10 | |
| Loss of extreme joint of forefinger | 5 | |
| Forefinger with stiff metacarpophalangeal joint in outstretched position | 5 | |
| Forefinger with 90 degrees or more stretch deficiency in middle joint | 5 | |
| Loss of middle finger (third finger) | 10 | |
| Loss of middle and extreme joints of middle finger | 8 | |
| Loss of extreme joint of middle finger | 5 | |
| Middle finger with stiff metacarpophalangeal joint in outstretched position | 5 | |
| Middle finger with 90 degrees or more stretch deficiency in middle joint | 5 | |
| Loss of ring finger (fourth finger) | 8 | |
| Loss of middle and extreme joints of ring finger | 5 | |
| Loss of extreme joint of ring finger | 3 | |
| Ring finger with stiff metacarpophalangeal joint in outstretched position | 5 | |
| Ring finger with 90 degrees or more stretch deficiency in middle joint | 5 | |
| Loss of little finger (fifth finger) | 8 | |
| Loss of middle and extreme joints of little finger | 5 | |
| Loss of extreme joint of little finger | 3 | |
| Loss of thumb and forefinger (1st and 2nd fingers) | 40 | 35 |
| Loss of extreme joints of thumb and forefinger | 18 | |
| Loss of thumb, forefinger and middle finger | 50 | 45 |
| Loss of extreme joints of thumb, forefinger and middle finger | 20 | |
| Loss of thumb, forefinger, middle finger and ring finger (1st, 2nd, 3rd and 4th fingers) | 55 | 50 |
| Loss of forefinger and middle finger (2nd and 3rd) | 25 | |
| Loss of middle and extreme joints of forefinger and middle finger | 20 | |
| Loss of extreme joint of forefinger and middle finger | 10 | |
| Loss of forefinger, middle finger and ring finger | 35 | 30 |
| Loss of middle and extreme joints of forefinger, middle finger and ring finger | 25 | |
| Loss of extreme joints of forefinger, middle finger and ring finger | 12 | |
| Loss of forefinger, middle finger, ring finger and little finger (2nd, 3rd, 4th and 5th) | 40 | 35 |
| Loss of middle and extreme joints of forefinger, middle finger, ring finger and little finger | 35 | 30 |
| Loss of extreme joints of forefinger, middle finger, ring finger and little finger | 15 | |
| Loss of middle finger, ring finger and little finger (3rd, 4th and 5th) | 30 | |
| Loss of extreme joints of middle finger, ring finger and little finger | 20 | |
| Loss of ring finger and little finger (4th and 5th) | 20 | |
| Loss of middle and extreme joints of ring finger and little finger | 15 | |
| Loss of extreme joints of middle finger and ring finger or of ring finger and little finger | 5 | |
| Middle finger and ring finger with 90 degrees or more stretch deficiency in middle joint | 8 | |

#### b. Hand, Wrist

| | Right | Left |
|---|---|---|
| Loss of one hand | 60 | 55 |
| Stiffness in good working position | 10 | |
| Stiffness in poor working position | 15 | |
| Fracture of radial bone healed with some dislocation and slight functional disturbances, possible friction | 5 | |
| Consequences of fracture of radial bone: forefinger to little finger down to 2 cm from the palm of the hand | 18 | |

#### c. Arm

| | Right | Left |
|---|---|---|
| Loss of one arm | 70 | 65 |
| Amputation of upper arm | 65 | 60 |
| Amputation of forearm with good elbow movement | 60 | 55 |
| Amputation of forearm with poor elbow movement | 65 | 60 |
| Unhealed rupture of biceps | 5 | |
| Axillary thrombosis | 5 | |

#### d. Elbow

| | Right | Left |
|---|---|---|
| Stiffness in outstretched position | 45 | 40 |
| Stiffness in good working position | 25 | 20 |
| Stiffness in poor working position | 30 | 25 |
| Cessation of rotary function of forearm ("upright position") | 20 | 15 |
| Elbow bending reduced to 90 degrees or less | 16 | 12 |
| Stretch deficiency of up to 40 degrees | 3 | |
| Stretch deficiency 40-90 degrees | 5 | |

#### e. Shoulder
All mobility reckoned with "unset" shoulder blade:

| | Right | Left |
|---|---|---|
| Stiffness in shoulder (with arm alongside body) | 35 | |
| Elevation up to 90 degrees | 16 | |
| Friction and some reduction of mobility | 5 | |
| Habitual luxation | 10 | |
| Luxation acromio-clavicularis | 5 | |

#### f. Paralysis

| | Right | Left |
|---|---|---|
| Total paralysis of plexus brachialis | 70 | 65 |
| Total paralysis of nervus radialis on the upper arm | 25 | 20 |
| Total paralysis of nervus ulnaris | 30 | 25 |
| Total paralysis of nervus medianus, both sensory and motoric injuries | 35 | 30 |
| For sensory injuries only | 10 | |

### B. Foot, Leg, Hip

#### a. Foot

| | Right | Left |
|---|---|---|
| Loss of foot with good function of prosthesis | 30 | |
| Loss of foot with poor function of prosthesis | 35 | |
| Amputation of tarsus with stump capable of bearing | 15 | |
| Loss of all toes on one foot | 10 | |
| Loss of 1st toe (big toe) and some of its metatarsal bone | 8 | |
| Loss of 1st toe (big toe) | 5 | |
| Loss of extreme joint of big toe | 3 | |
| Big toe with stiffness in metatarsophalangeal joint | 5 | |
| Loss of one of the other toes | 3 | |
| Ankle joint stiff at right angle or slight talipes equinus (up to 15 degrees) | 15 | |
| Ankle joint stiff in pronounced talipes equinus position | 20 | |
| Ankle joint where rotary mobility has ceased | 5 | |
| Fallen arches aggravated by pains | 8 | |
| Traumatic fallen arches | 10 | |

#### b. Leg

| | Right | Left |
|---|---|---|
| Loss of one leg | 65 | |
| Amputation at the knee or thigh with good function of prosthesis | 50 | |
| Amputation at the knee or thigh with poor function of prosthesis | 55 | |
| Loss of crus (shank) with good function of prosthesis | 30 | |
| Loss of crus with poor function of prosthesis | 35 | |
| Shortening by less than 3 cm | 3 | |
| Shortening of at least 3 cm | 10 | |
| Thigh shrinkage of at least 3 cm (in not, however, added to the compensation for shortening or reduction of mobility) | 8 | |
| Postthrombotic syndrome in one leg | 5 | |
| Essential deterioration of varicose veins or leg sores | 8 | |
| Knee stiff in good position | 25 | |
| Knee with stretch deficiency of up to 5 degrees | 3 | |
| Knee with bending capacity reduced to 90 degrees or less | 10 | |
| Knee with hampering looseness | 10 | |
| Knee with strong friction during movements, with muscle wastage exceeding 2 cm as measured 10 cm above the patella and reduction of mobility | 8 | |
| Knee with somewhat regular and hampering incarcerations | 5 | |
| Habitual luxation of kneecap | 5 | |
| Loss of kneecap | 6 | |
| Well functioning totally artificial kneecap | 15 | |

#### c. Hip

| | Right | Left |
|---|---|---|
| Hip with stiffness in favourable position | 30 | |
| Hip with severe insufficiency of hip function | 50 | |
| Well functioning totally artificial hip joint | 10 | |

#### d. Paralysis

| | Right | Left |
|---|---|---|
| Total paralysis of nervus ischiadis | 10 | |
| Total paralysis of nervus femoralis | 20 | |
| ischiadicus paresis - with good mobility | 10 | |
| ischiadicus paresis - with poor mobility | 30 | |

## COMPENSATION SCALE

## II. THE HEAD

| | Percentage Compensation |
|---|---|
| **A. The Face** | |
| Loss of all teeth (double dentures) | |
| Loss of outer ear | 5 |
| Scalping | 5 |
| One-sided paralysis of the facialis nerve | 5 |
| Two-sided paralysis of the facialis nerves | 10 |
| Loss of sense of smell | 15 |
| One-sided paralysis of vocal chords | |
| with considerable speech difficulties | 10 |
| Paralysis of sensory (trigeminal) nerve to the face | 5 |
| | |
| **B. The Brain** | |
| **a. Dementa** | |
| Mild demens | 15 |
| Mid-medium severe demens | 25 |
| Medium severe demens | 40 |
| Severe demens | 55 |
| Total demens | 100 |
| | |
| **b. Postcommotional Syndrome** | 8 |
| | |
| **C. The Eye** | |
| Loss of one eye | 20 |
| Loss of both eyes | 100 |
| Loss of sight of one eye | 20 |
| Loss of sight of both eyes | 100 |
| Loss of sight of one eye with complications (e.g. glaucoma and/or contracted eye) | 25 |
| Loss of sight of one eye with possibility of improvement via operation (reserve eye) | 18 |
| Double vision | 10 |
| Double vision in outermost position | 3 |
| Loss of binocular vision (e.g. aphakia with visual power of at least 6/60) | 15 |
| Aphakia with good contact glass function | 8 |
| Total one-sided ptosis | 18 |
| Flood of tears | 3 |
| Hemianopsia | 40 |
| Right/sided hemianopsia as a result of brain injury | 60 |

Reduction of visual power of one or both eyes is assessed in accordance with the following decimal table or fraction table:

**Decimal Table**

| | .9 | 0.8 | 0.6 | 0.4 | 0.3 | 0.2 | 0.1 | 0.0 |
|---|---|---|---|---|---|---|---|---|
| | 0.6 | 0 | 0 | 5 | 10 | 10 | 15 | 20 |
| | 0.5 | 0 | 5 | 5 | 10 | 10 | 15 | 20 |
| | 0.4 | 5 | 5 | 10 | 15 | 15 | 20 | 30 |
| | 0.3 | 10 | 10 | 15 | 23 | 35 | 45 | 55 |
| | 0.2 | 10 | 10 | 15 | 35 | 45 | 60 | 70 |
| | 0.1 | 15 | 15 | 20 | 45 | 60 | 75 | 85 |
| | 0.0 | 20 | 20 | 20 | 55 | 70 | 85 | 100 |

**Fraction Table**

| | 6 | 6/6 | 6/12 | 6/18 | 6/24 | 6/36 | 6/60 | 2/60 | 0 |
|---|---|---|---|---|---|---|---|---|---|
| | 6/6 | 0 | 0 | 5 | 8 | 10 | 12 | 15 | 20 |
| | 6/12 | 0 | 5 | 10 | 18 | 12 | 15 | 18 | 20 |
| | 6/18 | 5 | 10 | 20 | 30 | 35 | 40 | 45 | 60 |
| | 6/24 | 8 | 10 | 30 | 35 | 45 | 60 | 55 | 60 |
| | 6/36 | 10 | 12 | 35 | 45 | 55 | 65 | 70 | 75 |
| | 6/60 | 12 | 15 | 40 | 50 | 65 | 75 | 80 | 85 |
| | 2/60 | 15 | 18 | 45 | 55 | 70 | 80 | 95 | 100 |
| | 0 | 20 | 20 | 60 | 60 | 75 | 85 | 100 | 100 |

Visual power is assessed with the best available glasses

**D. Ears**

| | |
|---|---|
| Loss of outer ear, see under II.A. - The Face | |
| Total loss of hearing in one ear | 10 |
| Total loss of hearing in both ears | 75 |

Loss of hearing based on speech audiometry : assessed or calculated binaural loss of hearing in db with with all adjusted hearing aid.

| Degree of Loss of Hearing | HH 0 | HH 1 | HH 2 | HH 3 | HH 4 | HH 5 |
|---|---|---|---|---|---|---|
| CH 0 | 0 | 5 | • | • | • | • |
| CH 1 | - | 8 | 15 | 30 | • | • |
| CH 2 | - | 13 | 20 | 35 | 50 | - |
| CH 3 | - | - | 30 | 40 | 55 | 65 |
| CH 4 | - | - | - | 50 | 60 | 70 |
| CH 5 | - | - | - | - | 65 | 75 |

HH= Hearing Handicap        CH = Communication Handicap

| | |
|---|---|
| 0 - no handicap | 3 - considerable handicap |
| 1 - slight handicap | 4 - severe handicap |
| 2 - mild to medium handicap | 5 - total handicap |

Normally, no compensation is paid solely in respect of use of a hearing aid.

Hampering tinnitus and distortion of hearing ... 3

## III. NECK AND BACK

| | Percentage Compensation |
|---|---|
| **A. Vertebral Column** | |
| **a. Fracture of body of the vertebra without discharge of medulla spinalis or nerves :** | |
| *Minor fracture* | |
| With minor reduction of mobility | 5 |
| *Medium severe fracture* | |
| Without reduction of mobility | 8 |
| With reduction of mobility | 12 |
| *Very severe fracture or several medium severe fractures, possibly with formation of gibbus (hump)* | |
| Slight to some reduction of mobility | 15 |
| Very severe reduction of mobility | 20 |
| If support (neck collar or support corset) is used | 5 |
| Pain - local or transmitted to extremities | 2 |
| | |
| **b. Fracture with Discharge of Medulla Spinalis or Nerves** | |
| Assessed in accordance with the above rules with a supplementary degree for the discharge of nerves assessed in accordance with the other rules specified in the table | |
| | |
| **B. Consequences of Slipped Disc** | 12 |
| | |
| **C. Other Back Injuries** | |
| **a. Cervical Column** | |
| Some reduction of mobility and/or local pains | 8 |
| If a supportive device (neck collar) is used | 12 |
| Radiating pains - root irritating | 12 |
| | |
| **b. Other Parts of the Vertebral Column** | |
| Back pains without reduction of mobility | 5 |
| If a supportive device (corset) is used | 8 |
| Back pains with some reduction of mobility | 12 |
| Back pains with considerable reduction of mobility | 25 |
| | |
| **D. Injuries to Medulla Spinalis** | |
| Mild but lasting consequences - without bladder (possibly defecation) symptoms (objectively determinable neurological symptoms on a modest scale) | 20 |
| Mild but lasting consequences - with bladder (possibly defecation) symptoms (objectively determinable neurological symptoms on a modest scale) | 25 |
| Other lasting consequences without bladder symptoms as defined above | 30 |
| Other lasting consequences with bladder symptoms as defined above. Incontinence - please see section V. | 55 |

## IV. HEART AND LUNGS

Heart and lung ailments are assessed with regard to the limiting of the functional capacity caused by the ailment applying the following division into function groups :

| | |
|---|---|
| 1 No limitation of physical activity | |
| 2 Minor limitation of physical activity (Symptoms appear only during strenuous activity) | 3 |
| 3 Considerable limitation of physical activity (Symptoms also appear during low levels of activity) | 20 |
| 4 Any form of physical activity produces symptoms, which can also be present during periods of rest | 45 |
| | 70 |

Steps are taken to support the division into functions by means of objective measurements for lung function, such as the forced exhalation volume in the first second, FEV 1.0

Assuming that the case is one of permanent reduction of FEV 1.0,
FEV 1.0 of over 2 litres corresponds roughly to function group 1,
FEV 1.0 of 1.5-2 litres corresponds roughly to function group 2,
FEV 1.0 of about 1 litre corresponds roughly to function group 3, and
FEV 1.0 of about 0.5 litre corresponds roughly to function group 4.

## V. ABDOMINAL CAVITY AND PELVIS

| | |
|---|---|
| Loss of spleen | 5 |
| Loss of one kidney | 10 |
| Well functioning transplanted kidney | 25 |
| | |
| Anus praeternaturalis | 10 |
| Minor incontinence (i.e. imperious urination, possibly defecation) | 10 |
| Expulsive incontinence | 25 |
| Abdominal hernia, inoperable | 20 |
| | |
| Loss of both testicles | 10 |
| Loss of both ovaries before menopause | 10 |
| Loss of both ovaries after menopause | 2 |
| Loss of one or both epididymidae | 2 |
| Urethra stricture, if a bougie must be used | 15 |
| Impotence | Not covered |